707 P.2d 490

**Harlan B. JENSEN, d/b/a Jensen Construction, Plaintiff-Respondent,**

v.

**Bartlett R. WESTBERG, Barton F. Bailey, Thomas A. Dobrusky and Minidoka Associates, Defendants-Appellants.**

No. 15780.

Court of Appeals of Idaho.

Oct. 1, 1985.

Kenneth L. Mallea (Givens, McDevitt, Pursley, Webb & Buser), Boise, for defendants-appellants.

R. Brad Masingill, Weiser, for plaintiff-respondent.

BURNETT, Judge.

We are asked to determine the meaning of an agreement by which a building contractor and a group of investors purportedly allocated their liabilities for cost overruns in a construction project. The project, located on property owned by Minidoka Associates, was financed by the Idaho Housing Agency (IHA). For reasons not germane to this appeal, the contractor, Harlan Jensen, incurred substantial costs beyond the bid price of the project. Most of these extra costs ultimately were disapproved by IHA. Nevertheless, Jensen claimed that the costs were legitimate and he sued the investors, Bartlett Westberg, Barton Bailey and Thomas Dobrusky, seeking contribution. The investors answered, in essence, that they should bear no liability for those overruns which were disapproved by IHA. The district court disagreed and entered summary judgment for the contractor. This appeal followed. For reasons explained below, we vacate the judgment.

The pertinent facts are undisputed. The contractor and the investors were partners in a construction project at Rupert, Idaho. IHA underwrote the project for a bid price

of $866,000.[1] After it became apparent that costs in excess of this figure would be incurred, the partners received and accepted an offer from a third party to purchase their interest in the project. Incident to this agreement, the partners executed a "Memorandum of Understanding" among themselves. The memorandum provided that certain payments from the third party would be allocated to the contractor as compensation for any "cost overruns ... defined in paragraph 5...."[2] Paragraph five provided as follows:

> "Cost overruns", as used in this agreement, shall mean all actual costs of construction of the project, as certified by the Idaho Housing Agency in approving the final cost certification, which exceed the amount allowed and approved by the Idaho Housing Agency for construction....

Although the record is not entirely clear, it appears that the third-party sale was not eventually consummated. Nevertheless, both the contractor and the investors have argued, in the district court and on appeal, that the "Memorandum of Understanding" represented the final expression of the parties' agreement concerning liability for cost overruns. We will decide the case accordingly.

Our task is to determine whether paragraph five imparts a meaning to the term "cost overruns" that can be applied logically to the undisputed facts before us. The paragraph contains two components: (a) "all actual costs of construction of the project, as certified by the Idaho Housing Agency in approving the final cost certification," and (b) "the amount allowed and approved by the Idaho Housing Agency for construction...." The excess of (a) over (b) constitutes, by definition, the "cost overruns." The district court held that

paragraph five conveys a clear meaning. In the court's view, part (a) refers to "contractor's costs" of $982,000, as shown on a "Cost Certification" prepared by IHA; and part (b) refers to IHA's contract commitment of $866,000. Accordingly, the court entered judgment against the investors for their share of "cost overruns" totalling $116,000 ($982,000 less $866,000), plus interest.

However, we find the language of paragraph five to be more perplexing. Neither the contractor nor the investors has provided, in our view, a workable interpretation of part (a). The contractor argues that part (a) refers to all of his actual costs. This argument largely disregards the phrase "as certified by the Idaho Housing Agency in approving the final cost certification." In contrast, the investors contend that the quoted phrase limits the contractor's "actual costs" to those approved by IHA. But this contention strikes us more as a leap of faith than as a rigorous construction of the quoted language. The words "as certified ... in approving the cost certification," are so burdened with redundancy and awkward syntax that they convey no clear meaning to us.

Moreover, as the district judge noted, if the investors' interpretation were adopted, it would blur the distinction between the costs enumerated in part (a) and the costs "allowed and approved" in part (b). Absent such a distinction, there would be no difference between these costs. "Cost overruns" would not exist. The investors seek to avoid this absurdity by suggesting that amounts "approved" in part (a) might differ from amounts "allowed and approved" in part (b). However, no such difference is reflected in the IHA's "Cost Certification." That document simply shows the "contractor's costs," the "costs

---

1. For ease of discussion, all dollar amounts set forth in this opinion have been rounded.

2. A cross-reference to paragraph five also appeared in paragraph four of the memorandum. Paragraph four provided that if the contractor had received "interim payments" for cost overruns "in excess of the amount of cost overruns actually and finally determined by the final cost

certification as approved by Idaho Housing Agency," he would have been required to "refund" the excess to the investor-partners in equal shares. Because the record fails to disclose any such "interim payments," we presume, as did the district court, that this paragraph is inapplicable to the instant controversy.

disallowed," and the "net allowable costs." It creates no category of costs "approved" but not "allowed." The investors would have us infer such a category from the existence of a gap between the "net allowable costs," computed as $875,000, and the IHA's maximum contract commitment of $866,000. The investors characterize this $9,000 increment as costs approved but disallowed. We disagree. The gap is not between costs "approved" and costs "allowed." Rather, it is simply between costs allowed and IHA's funding limit for this project.

Part (b) presents other nettlesome problems. As the foregoing discussion demonstrates, the investors—having argued that costs in part (a) are limited to those "approved" by the agency—must ascribe a different meaning to costs "allowed and approved" in part (b). They suggest that part (b) refers to IHA's maximum contract commitment. Therefore, they conclude, their liability is limited to the $9,000 gap between "approved" costs and the contract maximum. However, as we have noted, this effort to equate costs "allowed and approved" with the agency's funding ceiling simply does not comport with the computation of "costs disallowed" and "net recoverable costs" on IHA's "Cost Certification."

It would seem more logical to construe the amounts "allowed and approved" in part (b) as the "net allowable costs" disclosed on the "Cost Certification." But this construction reveals an anomaly underlying paragraph five. If "cost overruns" were determined by subtracting the "net allowable costs" from the contractor's actual costs, as shown on the "Cost Certification," then the investors' liability would *exclude* the $9,000 difference between the agency's contract commitment and the "net allowable costs." No one in this case has asserted that the investors should avoid liability for this portion of the "cost overruns." Indeed, the investors have conceded liability for their share of this sum.

In short, the parties have not furnished, and we have been unable to identify, a single cognate set of meanings for parts (a) and (b) of paragraph five which can be applied consistently to the IHA's "Cost Certification." Consequently, we are unable to discern from the "Memorandum of Understanding" how the parties intended to deal with the cost overruns eventually computed by IHA. Our first resort in construing the parties' agreement is to the instrument itself. *E.g., Suchan v. Suchan*, 106 Idaho 654, 682 P.2d 607 (1984). But where, as here, the parties' intent cannot be understood from the instrument, such intent becomes a question of fact to be determined in light of extrinsic evidence. *E.g., Bennett v. Bliss*, 103 Idaho 358, 647 P.2d 814 (Ct.App.1982).

In this case, the extrinsic evidence appears to be in conflict. The contractor urges that he executed the "Memorandum of Understanding" in order to assure recovery of all actual costs. In contrast, the investors assert that they executed the memorandum in order to prevent the contractor's recovery of excessive cost overruns. Because the record is conflicting and because, in any event, this case is on appeal from a summary judgment, the question of intent is not suitable for appellate disposition. The district court on remand is instructed to determine, from all the evidence, whether the parties actually reached a genuine meeting of minds on "cost overruns." If they did, the court shall enter judgment conforming to their mutual intent. If they did not, the court should employ equitable principles to resolve the dispute.

Accordingly, the judgment below is vacated. The case is remanded for further proceedings consistent with this opinion. Costs to the appellants. No attorney fees on appeal.

WALTERS, C.J., concurs.

SWANSTROM, J., concurs in the result.